IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| | : | NO. 07-2666 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FRAZER EXTON DEVELOPMENT LP, | : | |
| | : | |
| Defendant. | : | |
| | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          JULY 24, 2008

        This case arises out of efforts to clean up a site
located at 15 South Bacton Hill Road in East Whiteland Township,
Chester County, PA (the "Site") pursuant to the Comprehensive
Environmental Response, Compensation, and Liability Act
("CERCLA").  Before the Court is a motion by the Environmental
Protection Agency ("EPA") to approve a consent decree between the
EPA and Frazer Exton Development LP ("FED").  Following a
hearing, the Court now approves the consent decree.


I.   BACKGROUND

     A.   The Site

        The Site in this case was previously owned and operated
by the Foote Mineral Company as a chemical processing facility
known as the Frazer Facility.  The Site is located on or near the

land where the Frazer Facility was located.[1]  The Frazer Facility was operated by Foote Mineral[2] until 1991, when the Facility was closed and the buildings demolished.  The Facility's operation created large quantities of hazardous substances, which were disposed of in limestone quarries on the Facility's property.  These substances contaminated soil on the Site and the ground water beneath the Site, causing a plume of contamination that extends approximately two miles east of the Frazer Facility.

On November 20, 1998, Frazer/Exton Development ("FED") purchased the Site to develop for residential use.  FED had full knowledge of the existing contamination of the Site.

B.  Enforcement History

During the 1970s and 1980s, Foote Mineral engaged in clean-up and monitoring efforts pursuant to administrative orders issued by the Commonwealth of Pennsylvania.  The EPA became involved in remediation efforts in 1988.  On June 29, 1990, the EPA entered into a consent order with Foote Mineral requiring Foote to conduct a groundwater survey, institute a five-year monitoring program of private drinking water supplies, and

---

[1]  The Site is comprised of the contaminated portions of the Frazer property, as well as nearby areas that were not a part of the Frazer property, but were contaminated as hazardous substances migrated through the groundwater.

[2]  In 1988, Foote Mineral was purchased by Cypress Mineral Company, but the purchase has no effect on the consent decree.

provide an alternative drinking water source to affected residents.  The Site was added to the National Priorities List of Superfund Sites in October 1992.  In September 1996, the EPA and Foote entered into a second consent decree that required Foote to conduct a remedial investigation and feasibility study.

On March 31, 2006, the EPA issued a Record of Decision ("ROD"), selecting a permanent remedy for the Site.  FED and Chemetall Foote Corporation, the sucessor-in-interest to Foote Mineral, were notified of their potential liability to remedy the site under CERCLA.  On July 21, 2006, FED volunteered to perform the work required by the ROD.  Chemetall declined to negotiate an agreement with the EPA.

C.  Current Consent Decree

On January 22, 2007, as a result of FED's offer to perform the work required by the ROD, the EPA and FED entered into an Administrative Settlement Agreement and Order on Consent for the purpose of commencing the design phase of the remedial action contemplated by the ROD.  Notice of the proposed consent decree was lodged with this Court on June 26, 2007.  The United States requested that the Court take no action on the consent decree at that time.

Notice of the proposed consent decree was also published in the Federal Register for at least thirty days to afford an opportunity for public comment.  East Whiteland

-3-

Township is the only entity that commented on the proposed consent decree.

Under the proposed consent decree, FED will reimburse EPA for half of its outstanding costs ($311,447) and will pay the interim and future costs contemplated by the consent decree.  FED will also pay for and perform the remedial action that was selected by the EPA in the ROD.  Essentially, the ROD calls for 1) removal of the waste and contaminated soil from the site; 2) steps such as placing clean fill on the Site and capping the quarries to prevent the contamination of groundwater; 3) long-term monitoring of the groundwater; 4) institutional controls to prevent residential use of impacted groundwater and the capped quarry areas; and 5) review of the progress of the remedy at least once every five years to ensure that the remedy continues to be protective of public health and the environment.

FED has commenced work under the ROD.  Initially, EPA estimated the cost of the ROD at approximately $14 million.  The Government's motion states that, as of the motion, FED had actually spent about $7 million and expects to spend about $16 million more to complete the work.  At the hearing on July 24, 2008, defendant informed the Court that even more progress has been made since the Government provided these numbers to the Court.  As of the hearing, defendant had spent approximately $29 million on the Site and anticipated that about $2.5 million worth

-4-

of work and monitoring remained to be done.

    D.    <u>Explanation of Significant Differences</u>

During the course of the work that FED has already conducted, it was learned that the volume of contaminated soil is larger than was estimated in the ROD.  Therefore, the ROD had to be revised.  On April 7, 2008, EPA signed an Explanation of

Significant Differences[3] ("ESD") to officially revise the ROD.  The ESD amends the ROD by expanding the area to be capped, revising clean-up standards for certain contaminants, and "allowing the use of permeability barriers in areas where the depth of the contaminated soil is such that the volume is too large to fit into the expanded capped areas."  Gov't's Response to Comments 6 (doc. no. 4).

The ESD was advertised and initially released to the public on December 1, 2007, subject to a 30-day public comment period.  An EPA Public Availability Session was held at the East Whiteland Township Building on December 18, 2007 in order to

---

[3]    An explanation of significant differences is required by 42 U.S.C. § 9617, which provides that "the President or the State shall publish an explanation of the significant differences and the reasons such changes were made," if, "after adoption of a final remedial action plan," "any remedial . . . [or] enforcement action . . . is taken, or . . . any settlement or consent decree . . . is entered into, and . . . such action, settlement, or decree differs in any significant respects from the final plan."

-5-

discuss the ESD and answer any questions about it.[4]

II.  LEGAL STANDARD

"A court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals.  In evaluating the fairness of a consent decree, a court should assess both procedural and substantive considerations.  Procedural fairness requires that settlement negotiations take place at arm's length.  A court should look to the negotiation process and attempt to gauge its candor, openness and bargaining balance.  Substantive fairness requires that the terms of the consent decree are based on comparative fault and apportion liability according to rational estimates of the harm each party has caused.  As long as the measure of comparative fault on which the settlement terms are based is not arbitrary, capricious, and devoid of a rational basis, the district court should uphold it.  A consent decree only need be based on a rational determination of comparative fault, . . . whether or not [a district court] would have employed the same method of apportionment.  In re Tutu Water Wells CERCLA Litig., 326 F.3d 201, 207 (3d Cir. 2003).  A district court's approval of a consent decree is reviewed for abuse of discretion.  Id.

---

[4]     If the proposed consent decree is entered, the parties will file a motion to incorporate the ESD revisions into the consent decree.  Gov't's Response to Comments 6.

-6-

III. APPLICATION

No objections were filed opposing the entry of the consent decree.  During the public comment period, East Whiteland Township, the township in which the Site is located, made 19 comments regarding the decree.  In its comments, East Whiteland argued that the "Consent Decree is unusual and/or 'inappropriate, improper and/or inadequate'" because of the issues identified in East Whiteland's comments.  East Whiteland's comments are addressed in detail on pages 13-33 of the United States' Response to Comments.[5]  At the hearing on July 24, 2008, East Whiteland informed the Court that it is satisfied with the Government's and the Defendant's responses to its comments and that it does not oppose the entry of the consent decree.[6]

---

[5]     The comments themselves are attached as Exhibit A to the United States' Response.

[6]     One issue raised by East Whiteland in its comments was also raised by the Court and addressed by the parties at the hearing.  The consent decree requires that FED must give notice of the consent decree and other information relating to this case to a grantee of a property interest "at least thirty days prior to the conveyance of any interest in property owned or controlled by [FED] located within the Site including, but not limited to, fee interests, leasehold interests, and mortgage interests."  Consent Decree ¶ V.9.b.  "The transfer of a life estate interest to a prospective occupant of the Property shall not be deemed a conveyance of an interest in property for purposes of this [notice] provision."  Id.

     The Site is being developed by FED into an age-restricted community for retired individuals.  The inhabitants of the community receive life estates.  The concern raised by East Whiteland and the Court is that the consent decree specifically

First, East Whiteland criticized the order in which work on the Site has proceeded.  After the ROD was adopted by the EPA, FED began work on the site.  East Whiteland complained that this work cannot possibly comply with the consent decree and that it was inappropriate for work to begin before entry of the Consent Decree.

Section 9622(e)(6), Title 42 of the U.S. Code provides that, after a remedial investigation has been initiated by the President, remedial action should not be undertaken at the site unless approved by the President.  42 U.S.C. § 9622(e)(6). Here, the work undertaken by FED at the Site has been supervised by the EPA and the work has been in conformity with the ROD, which was approved by the EPA.  Furthermore, the Government points out that, even though some work has been done, FED will still have to meet each quality assurance requirement in the consent decree.  The consent decree provides for a variety of

---

relieves FED from an obligation to give notice to the very people who will inhabit the Site.

At the hearing, the parties explained that the Consent Decree's statement that the transfer of a life estate shall not be deemed a conveyance of a property interest was designed to avoid any potential liability on the part of the life estate holders.  Purchasers of life estates on the Site have thus far received notice that the Site is a Superfund site and, pursuant to an agreement between FED and East Whiteland, they will continue to receive such notice.

measures, such as sampling and inspection, that will allow the
EPA to monitor progress and determine whether the work is
proceeding in conformity with the Consent Decree.  FED will still
be required to comply with all of these measures even though it
has already done some work.  Because EPA has approved the work
done at the site and will enforce all the requirements set forth
in the consent decree, the consent decree may be entered although
some work has been performed.

Second, East Whiteland disagreed with some of the
science underlying EPA's decisions.  In its responses, the EPA
lays out each dispute and explains the rationale for its
decision.  East Whiteland has provided only minimal information
about each dispute in its comments and cites to no scientific
authorities.  This unsupported criticism is insufficient to
overcome the deference owed to the EPA's judgment in negotiating
the consent decree.

IV.  CONCLUSION

Upon an examination of the proposed consent decree, the
Government's response to comments on the decree, and following a
hearing on the decree, the Court concludes that the decree is
procedurally and substantively fair, and that it is reasonable
and consistent with CERCLA's goal of "ensur[ing] the cleanup of
the nation's hazardous waste sites."  In re Tutu Water Wells, 326

F.3d at 206.  Therefore, the Court will grant the Government's motion to approve and enter the consent decree.